UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADRIAN FORD,

      Plaintiff,    Civil Action No. 17-11772
              Honorable Stephen J. Murphy, III
              Magistrate Judge David R. Grand
v.

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [17, 18]**

 Plaintiff Adrian Ford ("Ford") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [17, 18], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.  RECOMMENDATION**

 For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Ford is not disabled under the Act. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [18] be GRANTED, that Ford's Motion for Summary Judgment [17] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On September 1, 2015, Ford filed an application for SSI, alleging a disability onset date of July 1, 2008.  (Tr. 35, 77, 96, 199, 214).  This application was denied at the initial level.  (Tr. 96).  Ford filed a timely request for an administrative hearing, which was held on January 4, 2017, before ALJ Kevin W. Fallis.  (Tr. 32-75).  Ford, who was represented by attorney Robert Crites, testified at the hearing, as did Ford's friend/roommate/attorney, Erwin Frederick Meiers III, and vocational expert ("VE") Judith Findora.[1]  (*Id.*).  On March 8, 2017, the ALJ issued a written decision finding that Ford is not disabled under the Act.  (Tr. 14-31).  On April 3, 2017, the Appeals Council denied review.  (Tr. 1-5).  Ford timely filed for judicial review of the final decision on June 5, 2017.  (Doc. #1).  The parties filed cross-motions for summary judgment (Docs. #17, #18), and Ford did not file a reply.

### B.     Framework for Disability Determinations

Under the Act, SSI benefits are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

---

[1] At the administrative hearing, the ALJ pointed out that Ford has prior applications from 2003 and 2012.  (Tr. 35).  In response to the ALJ's questioning about these applications, however, attorney Crites did not argue that they should be reopened.  (*Id.*).  The ALJ therefore determined that the protective filing date is September 1, 2015.  (*Id.*).

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.    Background

### 1.    The Record

Ford alleges disability as a result of dyslexia and a learning impairment.  (Tr. 219).  At the time of the administrative hearing, Ford was twenty-six years old.  (*See* Tr. 214).

The Court has thoroughly reviewed the record in this matter, including Ford's medical record, Function Report, Disability Reports, and the testimony provided by Ford and Meiers as to Ford's conditions and resulting limitations.  Instead of summarizing that information here, the Court will make references and provide citations to the record as necessary in its discussion of

the parties' arguments.

2.     *Vocational Expert's Testimony*

Judith Findora testified as an independent VE at the administrative hearing.  (Tr. 67-72, 257-58).  The ALJ found that Ford had no past relevant work.  (Tr. 68).  He asked the VE to imagine a hypothetical individual of Ford's age, education, and work experience who could perform work at all exertional levels but would have to avoid even moderate use of hazardous moving machinery, would have to avoid all exposure to unprotected heights, and would be limited to jobs that did not require complex written or verbal communication.  (Tr. 68-69).  The work would be limited to simple, routine, repetitive tasks; would be performed in a work environment that is free of fast-paced production requirements; and would involve only simple work-related decisions and routine workplace changes.  (Tr. 69).  In addition, there could only be occasional and superficial interaction with the public and with co-workers.  (*Id.*).  The VE testified that the hypothetical individual could perform jobs that exist in the national economy, such as:  cleaner at the light exertional level (Dictionary of Occupational Titles ("DOT") number 323.687-014; Specific Vocational Preparation ("SVP") of 2; 500,000 jobs); cleaner at the medium exertional level (DOT number 381.687-018; SVP of 2; 800,000 jobs); packer at the light exertional level (DOT number 525.687-118; SVP of 2; 250,000 jobs); and packer at the medium exertional level (DOT number 920.587-018; SVP of 2; 160,000 jobs).  (Tr. 69-70).

The ALJ then asked the VE to imagine a hypothetical individual with the same limitations as in the previous hypothetical but who could have no interaction with the public.  (Tr. 70).  The VE testified that a cleaner's job duties do not require interaction with the public, although a cleaner may have "incidental" contact with the public.  (*Id.*).  She indicated that the cleaner jobs that would be available are generally those where the cleaning is done after a

4

building closes for the day, which number 200,000 jobs in the light category and 600,000 jobs in the medium category.  (*Id.*).  As for the packer job, the VE testified that "there's no public back in where they'd be packing."  (*Id.*).

Next, the ALJ asked the VE to imagine a hypothetical individual with the same limitations as in the second hypothetical but with an additional limitation:  no interaction with co-workers.  (Tr. 71).  The VE testified that there would be no jobs available.  (*Id.*).

The ALJ then asked the VE to imagine a hypothetical individual with the same limitations as in the first and second hypotheticals, who in addition, would be off-task twenty percent of the day in addition to regularly-scheduled breaks.  (*Id.*).  The VE testified that whether there would be any jobs available for that individual would depend on what behavior they were exhibiting.  (*Id.*).  She explained that this limitation would be work preclusive if the behavior was visually distracting to co-workers, if the individual was physically getting up and leaving the worksite, and if the behavior was done on a regular and consistent basis (as opposed to just once or twice a week).  (*Id.*).

Finally, the ALJ asked the VE if any jobs would be available for a hypothetical individual who would be absent from work two days per month due to doctors' visits and symptoms.  (*Id.*).  The VE testified that there would be no jobs available, regardless of why he or she was missing work.  (*Id.*).  She stated that generally an individual can only be absent from work one day per month and still maintain employment.  (Tr. 72).

In response to questioning by Ford's attorney, the VE agreed that it is necessary, at least on some level, that an individual be able to respond appropriately to directions from a supervisor and cope with at least minor changes in the work environment.  (*Id.*).  The VE testified that if an individual was unable to do this, or if this ability was "severely degraded," work would be

precluded.  (*Id.*).

The VE stated that her testimony was consistent with the DOT, except for the portions of it not covered by the DOT:  absenteeism, time off-task, interaction with the public and with co-workers, quotas, and working in tandem on assembly lines.  (Tr. 71-72).  The VE explained that for these topics she relied on her own research and professional experience.  (Tr. 72).

### D.     The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Ford has not engaged in substantial gainful activity since September 1, 2015, the application date.  (Tr. 19).  Next, the ALJ found that Ford has the severe impairments of specific learning disorder in reading and mathematics, borderline intellectual functioning, adjustment disorder, and depression.  (*Id.*).  At Step Three, the ALJ found that Ford's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (*Id.*).

The ALJ then found that Ford retains the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: avoid even moderate use of hazardous moving machinery; no exposure to unprotected heights; limited to occupations that do not require complex written or verbal communication; limited to work with simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements and involving only simple work-related decisions and routine workplace changes; no interaction with the public; and only occasional superficial interaction with co-workers.  (Tr. 21).

At Step Four, the ALJ concluded that Ford has no past relevant work.  (Tr. 25).  At Step Five, the ALJ found that considering Ford's age, education, work experience, and RFC, he can perform the following jobs that exist in significant numbers in the national economy:  cleaner in

the light and medium exertional categories and packer in the light and medium exertional categories. (Tr. 26). Thus, the ALJ concluded that Ford is not disabled under the Act. (Tr. 27).

### E.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may

look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

**F.     Analysis**

In his summary judgment motion, Ford argues that the ALJ erred in:  (1) his analysis of an opinion by psychological consultative examiner Matthew P. Dickson, Ph.D.; (2) his evaluation of a reading and math assessment by Jane McCullough, M.A., and sworn affidavits by Meiers and Elizabeth Thomas, Ford's special education teacher; and (3) failing to consider Ford's work history and behavior at the hearing.  These arguments are addressed below.

*1.     The ALJ Properly Analyzed Dr. Dickson's Opinion*

On November 15, 2012, Dr. Dickson conducted a psychological consultative examination as part of Ford's prior application for benefits.  At the time, Ford was twenty-two years old.  (Tr. 342).  Dr. Dickson noted that Ford was driven to the appointment by a friend called Dawn and

that he presented a driver's license.  (*Id.*).  Ford told Dr. Dickson that he can "work with [his] hands and do stuff" and that he "get[s] frustrated when [he] do[es]n't comprehend something." (*Id.*).  Ford stated that he was not comfortable in society and that he was always in special education classes at school, where he spent all day in one room.[2]  (*Id.*).  He graduated from high school, but said that he was teased throughout school and had a hard time establishing and keeping friendships.  (*Id.*).  He denied taking medications and having a history of psychiatric hospitalization.  (*Id.*).  He reported that he was not receiving mental health services; he said he was only in counseling once, at the age of ten, when his parents were getting a divorce.  (*Id.*).  He reported that he had been charged with two counts of armed robbery, but the charges were dropped.  (*Id.*).  Dr. Dickson noted that Ford said that he worked most recently at "Southern Lakes Program," which was a work program through his school where he planted grass and trees, "threw hay down," and occasionally mowed a lawn.  (*Id.*).

Ford told Dr. Dickson that that he had a girlfriend of almost three years and that they lived together in a house his father left him when he died.  (*Id.*).  Ford said he only had contact with Dawn and his girlfriend and stated:  "I don't want to know anyone I don't have to know."

---

[2] The record indicates that in March 2008, out of the thirty hours Ford spent in school, only 1.25 hours were spent in special education and 28.75 hours were spent in general education.  (Tr. 323).  Although his progress in general education was affected by his "reading and math deficits," which were "significantly below grade level," Dr. Aimee Lyst "felt that these scores were not indicative of his ability as he did not want to participate to the best of his ability."  (Tr. 319).  In addition, it was noted that Ford had "developed work avoidance habits . . ."  (*Id.*).  Still, Ford expressed a desire to work "on autobody" and consistently did well in classes such as Welding I and Welding II, Job Skills, and Prototype Design.  (Tr. 298).  Furthermore, his grade in Social Skills went up a full letter from when he was in tenth grade to when he was in twelfth grade, and there was improvement in Ford's grades overall throughout his four years in high school (Ford's GPA went from a 2.55 in ninth grade (2004-05) to a 3.45 in twelfth grade (2007-08)).  (*Id.*).  Indeed, Ford's grades in his final year of school are strong; in his last trimester he earned three A's and one A-.  (*Id.*).  Ford's grades are consistent with a note from 2008 that list his strengths as:  "[l]oves to put things together, friendly, creative, likes to please adults[,] very hard working in areas that he enjoys[,] [g]ood sense of humor."  (Tr. 318).

(Tr. 342-43).  He described his history of interactions with students at school as "problematic" because he was teased; he recalled getting suspended "because people would pick on me and I would stand up for myself."  (Tr. 343).  He said he had friends when he was young, "but was a loner after that."  (*Id.*).  Dr. Dickson found that Ford's eye contact was below average and concluded that Ford "is pleasant with me, but clearly odd today."  (*Id.*).

Dr. Dickson wrote that Ford indicated that he spends his days with his girlfriend and playing with his dogs.  (*Id.*).  Ford reported that he can complete basic household chores, prepare food, manage his personal hygiene and self-care independently, drive a car, make purchases, and count money.  (*Id.*).  He said he shops with his girlfriend, who helps him with paperwork and any appointments.  (*Id.*).  He stated that he has never paid bills and has no income other than food stamps.  (*Id.*).  He stated that if he is given directions, he can find locations around town independently.  (*Id.*).  Dr. Dickson noted that Ford was casually dressed and that his hygiene and grooming appeared appropriate.  (*Id.*).

Results from Dr. Dickson's mental status examination include that Ford seemed to be in contact with reality, was cooperative, had "low" self-esteem, conveyed a "generally positive attitude," and was "markedly immature."  (*Id.*).  His speech was "mildly impaired," and his stream of mental activity was "spontaneous and organized."  (*Id.*).  He denied hallucinations and suicidal ideation, and he stated that he often has difficulty sleeping.  (*Id.*).  Dr. Dickson determined that Ford's affect was "appropriate to mood" and that he appeared depressed during the examination (he was tearful at times).  (Tr. 344).  Dr. Dickson opined that Ford appeared oriented to time, place, and person.  (*Id.*).  He recorded that Ford recalled five numbers forward and four numbers backward, and recalled two out of three words three minutes later.  (*Id.*).

Upon administering a Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), Dr. Dickson estimated that Ford's cognitive ability was in the borderline range given his full scale IQ of 74. (Tr. 345-46).  Dr. Dickson concluded that Ford's verbal comprehension and perceptual reasoning abilities were both in the low average range; his ability to sustain attention, concentrate, and exert mental control was in the extremely low range; and his ability to process simple or routine visual material without making errors was in the borderline range when compared to his peers. (Tr. 346).   Dr. Dickson opined that Ford's behavior during the examination was "rigid, defensive, impulsive, easily frustrated and angered, and easily distractible."  (*Id.*).  He found that Ford "evidences significant problems with concentration and focusing" and that "[h]e is restless at times."  (*Id.*).   Dr. Dickson's medical impression was that Ford's "mental abilities to understand, attend to, remember, and carry out instructions are moderately impaired" and that his "abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are markedly impaired."  (*Id.*).   Dr. Dickson diagnosed Ford with pervasive developmental disorder and borderline intellectual functioning, and assigned him a GAF score of 48.  (*Id.*).  He opined that Ford is unable to manage his own benefit funds and that his mental condition can be expected to persist for at least the next eighteen months.  (*Id.*).

The ALJ thoroughly reviewed these findings made by Dr. Dickson (Tr. 22) and evaluated them as follows:

> Dr. Dickson, an examining source, opines [that] the claimant's mental abilities [to] understand, attend to, remember and carry out instructions are moderately impaired, and his abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace is markedly impaired . . . . That opinion is accorded partial weight.  The record does not support marked limitations in any areas.  The claimant was evaluated by other medical professionals following this opinion and there is not support for this level of function.   At an examination on January 19, 2016, the mental health professional indicated no emotional symptoms.   Additional examinations by medical

11

professionals on May 13, 2016 and October 27, 2016 do not support marked limitations during their examinations. There is no indication of significant treatment for any psychological condition after that assessment.

(Tr. 24-25).

Ford takes issue with the ALJ's decision to give "partial weight" to Dr. Dickson's conclusion that Ford's "abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are markedly impaired." (Doc. #17 at 8). Ford argues that the ALJ improperly gave partial weight to this opinion based on purely conclusory and "egregiously unsupported" statements that contain no citations to the record. (*Id.*). In Ford's view, the ALJ "stated no actual basis for his refusal to fully evaluate or even consider Dr. Dickson's opinion, in violation of 20 CFR 416.927[(c)]."[3] (*Id.*). The Court disagrees.

Pursuant to 20 C.F.R. § 416.927(c), an ALJ must evaluate every medical opinion that is received, and unless the treating physician rule applies under § 416.927(c)(2), the following factors are to be considered in deciding what weight to give to a medical opinion: examining relationship, treatment relationship (including the length, nature, and extent of the treatment relationship), supportability, consistency, specialization, and any other factors raised by the claimant. 20 C.F.R. § 416.927(c). As to consistency, the regulation provides that "[g]enerally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 416.927(c)(4).

Here, Dr. Dickson was not a treating physician, and the ALJ fully evaluated and considered his opinion. In fact, the ALJ's discussion of Dr. Dickson's findings takes up half a

---

[3] The Court agrees with the Commissioner that even though Ford cites to 20 C.F.R. § 416.927(d), he presumably intended to cite to 20 C.F.R. § 416.927(c) instead. (Doc. #18 at 9-10). As the Commissioner explains, 20 C.F.R. § 416.927(d) addresses medical source opinions on issues reserved to the Commissioner, whereas 20 C.F.R. § 416.927(c) covers how medical opinions will be weighed and lists factors that adjudicators will consider. (*Id.*); 20 C.F.R. § 416.927(c), (d). Ford did not file a reply contesting this interpretation by the Commissioner.

single-spaced page in the decision.  (Tr. 22).  Moreover, the ALJ properly explained his decision to give partial weight to the portion of Dr. Dickson's opinion that found that Ford had marked limitations.  In compliance with 20 C.F.R. § 416.927(c), the ALJ based this decision on a finding that the opinion was not supported by – or was inconsistent with – the record.  As noted above, the ALJ explained that he accorded the opinion partial weight because "[t]he record does not support marked limitations in any areas," including evaluations by other medical professionals that post-date Dr. Dickson's opinion and do not provide support "for this level of function."  (Tr. 24-25).  The ALJ then pointed to three specific examinations to illustrate his point.  (Tr. 25).  He noted that "[a]t an examination on January 19, 2016, the mental health professional indicated no emotional symptoms" and that "[a]dditional examinations by medical professionals on May 13, 2016 and October 27, 2016 do not support marked limitations during their examinations."  (*Id.*). The ALJ also highlighted that there was "no indication of significant treatment for any psychological condition after that assessment."  (*Id.*).

Ford argues that the ALJ's explanation is made up of purely conclusory statements "without citation to the record."  (Doc. #17 at 8).  While this may be the case viewing in isolation the one paragraph where the ALJ analyzes Dr. Dickson's opinion, two pages earlier the ALJ dedicated three-quarters of a page to discussing in detail the findings made at the January 19, May 13, and October 27, 2016 examinations.  (Tr. 23).  And where the ALJ discussed these records, he included citations to the record.  (*Id.*).  The Sixth Circuit has held that in an RFC narrative, "the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record."  *Miller v. Comm'r of Soc. Sec.*, No. 1:15-CV-0638, 2016 WL 3411663, at *7 (W.D. Mich. June 22, 2016) (quoting *Delgado v.*

*Comm'r of Soc. Sec.*, 30 F. App'x 542, 548 (6th Cir. 2002); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729 (6th Cir. 2013)).   Thus, the Court agrees with the Commissioner that the "pertinent examinations were satisfactorily identified and discussed."  (Doc. #18 at 12).

A review of the records from these three examinations indicates that the ALJ's decision to give partial weight to Dr. Dickson's opinion is backed by substantial evidence.  On January 19, 2016, State agency evaluator Karen Marshall, Psy. D., LP, noted that Ford was not taking any medications and had never received psychological care.  (Tr. 348).  As the ALJ pointed out, Dr. Marshall concluded that "[n]o emotional symptoms were noted."  (Tr. 23, 25, 350).   In addition, Dr. Marshall recorded that Ford lived with a roommate, who he got along with well, and spent his day taking care of dogs.  (Tr. 348-49).  Ford told her that he grocery shopped with his roommate, microwaved meals, and washed dishes, but did not do laundry.  (Tr. 349).  Dr. Marshall wrote that Ford drove himself to the appointment, where he presented with appropriate hygiene and maintained "consistent eye contact."  (*Id.*).   Upon mental status examination, Dr. Marshall found Ford had an "intact reality" and average self-esteem.  (*Id.*).   She found that rapport was easily established, he was cooperative, he appeared to minimize cognitive deficits, and he had limited insight into his difficulty.  (*Id.*).   She opined that his stream of mental activity was organized (though "at times vague"), and that he was oriented times three.  (*Id.*).   His affect was appropriate, his mood was euthymic, he denied feelings of worthlessness, and he denied a history of depression or anxiety.  (*Id.*).   Dr. Marshall diagnosed Ford with a "Specific Learning Disorder with Impairment [], Provisional" in both reading and mathematics (Tr. 350) – a finding that the ALJ explicitly considered.  (Tr. 23).

On May 13, 2016, Gerald S. Kirzner, Ph.D., conducted a consultative examination of Ford.  (Tr. 359).  Dr. Kirzner recorded that Ford had lived with a friend for the last six months

and that his daily activities centered on spending time with a dog.  (Tr. 360).  He noted that Ford's physical hygiene and attire were "within normative standards."  (Tr. 360-61).  Dr. Kirzner's mental status examination resulted in him finding that Ford "did not overtly appear to be overtly [sic] depressed or anxious" and "did not frustrate readily."  (Tr. 361).

On October 27, 2016, Alexander Rodriguez, M.D., saw Ford for worsening symptoms of depression, which included a loss of interest, depressed mood, and hopelessness.  (Tr. 366).  But Ford was negative for crying spells, irritability, anxiety symptoms, and psychotic symptoms. (*Id.*).  Dr. Rodriguez diagnosed Ford with a single episode of "[c]hronic major depressive disorder," but his physical examination of Ford otherwise had all normal findings, including that Ford was oriented to person, place, and time.  (Tr. 367).

In addition to these three records that came after Dr. Dickson's opinion, on January 27, 2017, State Agency consultant Leonard C. Balunas, Ph.D., concluded that Ford's ability to work in coordination with or in proximity to others without being distracted by them was "[n]ot significantly limited."  (Tr. 83).  In addition, Dr. Balunas found that Ford did not have social interaction limitations and did not have adaptation limitations.  (*Id.*).  He wrote that Ford is able to respond appropriately to supervision, co-workers, and work situations and is able to deal with most changes in routine work settings.  (*Id.*).  Thus, substantial evidence supports the ALJ's decision to give a portion of Dr. Dickson's opinion partial weight.

On July 7, 2016, Dr. Kirzner provided an addendum to his May 13, 2016 report, where he wrote:  "Based on [his previous] findings and follow up questions [by attorney Crites] regarding [Ford's] employability and ability to interact with co-workers, supervisors etc[.] it is unlikely that Mr. Ford has the ability or the emotional temperament to sustain gainful, consistent employment where adaptations are required."  (Tr. 363).  Ford argues that this addendum, along

15

with other findings previously made by Dr. Kirzner on May 13, 2016, "fully support the opinion of Dr. Dickson, contrary to the ALJ's assertion."  (Doc. #17 at 9-10).  The findings made by Dr. Kirzner that Ford identifies include that his eye contact was minimal; he was slow to respond and was not self-directed; his motivational levels were low and subject to diminished energy levels; his mental process was slowed; his willingness to be open was characterized by concrete, constricted, and vague replies to open-ended questions; his articulation of words, grammar, and syntax was poor; and his affect was flat and constricted, with undertones of anger and frustration.  (*Id.* at 9).  In addition, Ford cites to Dr. Kirzner's conclusion that he "would have some difficulty being able to retain and follow through with simple, structured, and repetitive tasks" and that he could not handle benefit funds.  (*Id.*).

But the ALJ never said that Dr. Kirzner's addendum was at odds with Dr. Dickson's opinion.  Rather, he explained that "other medical opinions do not support the severity of the alleged impairments" found by Dr. Kirzner, and elsewhere in the decision, the ALJ referenced opinions such as the one "on January 19, 2016, [in which] the mental health professional indicated no emotional symptoms," and Dr. Marshall's which "is supported by examination, [] other medical opinions, and [Ford's] lack of psychological treatment."  (Tr. 25).  The ALJ also noted that Dr. Kirzner's opinion appeared to be based "on the subjective complaints and reporting of [Ford]," and Ford does not identify objective test results that would call into question this assessment by the ALJ.  In short, Ford does not appropriately challenge these findings by the ALJ, and because the ALJ's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip*, 25 F.3d at 286.

In his motion, Ford compiled a list of findings made by Dr. Dickson that the ALJ supposedly did not consider, including: that Ford's ability to sustain attention, concentration, and exert mental control was in the extremely low range; that his behavior during the examination was "rigid, defensive, impulsive, easily frustrated and angered and easily distractible"; that Ford showed significant problems with concentration and focus; that Ford was "restless at times"; that Ford's test performance was an accurate reflection of his abilities; that Ford had a GAF score of 48; and that Ford would not be able to manage his own funds.  (Doc. #18 at 8-9) (citing Tr. 346). Ford argues that the ALJ "considered none of these findings, and gave no explanation for how his RFC conclusion was consistent with this medical evidence."  (*Id.* at 9).

As already discussed, "[t]here is no requirement . . . that . . . the ALJ . . . must discuss every piece of evidence in the administrative record."  *Hamper v. Comm'r of Soc. Sec.*, 714 F. Supp. 2d 693, 703 (E.D. Mich. 2010) (citing *Kornecky*, 167 F. App'x at 508; V*an Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006)).  Moreover, "it is well settled that[] 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'"  *Kornecky*, 167 F. App'x at 508 (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).  Here, the ALJ's discussion of Dr. Dickson's report was sufficiently detailed so as to indicate that he considered this record in full, even though he did not reference every single finding made by Dr. Dickson in his written decision.  Furthermore, Ford has not shown how the ALJ's analysis would have been altered had he included these findings in his decision to the point that remand is warranted.  Thus, the ALJ properly evaluated Dr. Dickson's opinion, and remand is not appropriate as to this issue.

2.    *The ALJ Properly Considered McCullough's Assessment and Sworn Affidavits by Meiers and Thomas*

Ford criticizes the ALJ's analysis of McCullough's assessment, which he gave "little to partial weight," and sworn affidavits by Meiers and Thomas, which he gave "little weight." (Doc. #17 at 10-12; Tr. 25).  The Court finds that the ALJ committed no error in his evaluation of these "other source" opinions.

SSR 06-03p relates to the weight an ALJ may give to "Other Evidence from Sources Who Are Not 'Acceptable Medical Sources,'" including parents, other caregivers, and other relatives; friends; neighbors; and educational personnel such as school teachers, early intervention team members, and developmental center workers.  SSR 06-03p, 2006 WL 2329939, at *2-4, 6 (Aug. 9, 2006).  Under SSR 06-03p, these individuals are called "other sources."  *Id.*  They are considered "non-medical sources," and their opinions "cannot establish the existence of a medically determinable impairment" but "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  *Id.*; *see* 20 C.F.R. § 416.913(a)(4).  SSR 06-03p provides that the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case."  SSR 06-03p, 2006 WL 2329939, at *6.

Yet the regulations "do not explicitly address how to consider . . . other evidence from 'other sources.'"  *Id.* at *3.  Moreover, an "other source" opinion is not entitled to "any special deference," and "'SSR 06-03p . . . does not require that an adjudicator articulate 'good reasons' for the rejecting of an 'other source's' opinion[,]' as the ALJ must do when discounting an opinion by a treating source."  *Davis v. Comm'r of Soc. Sec.*, No. 1:16 CV 2446, 2018 WL 1377790, at *8 (N.D. Ohio Mar. 19, 2018) (internal citations omitted); *Alcaraz v. Comm'r of*

*Soc. Sec.*, No. 1:17-CV-255, 2018 WL 1477581, at *3 (W.D. Mich. Mar. 27, 2018) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). Ultimately, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources' . . . ." *Alcaraz*, 2018 WL 1477581, at *4 (quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)).

### a.  McCullough's Assessment

On December 3, 2016, Ford was administered the Kaufman Test of Educational Achievement. (Tr. 355-57). Ford's test results are on "Open World Reading Center" letterhead, which says under its logo, "Individualized, Diagnostic Instruction in Reading and Math for Children and Adults." (Tr. 356). McCullough's signature appears at the end of the test results as "Jayne McCullough M.A.," under which it says "Director/Diagnostician." (Tr. 357). Thus, given her role as educational personnel, McCullough is an "other source." SSR 06-03p, 2006 WL 2329939, at *2. In a separate letter that also appears on "Open World Reading Center" letterhead, McCullough wrote: "[Ford's] reading and math levels are at a beginning first grade level. He will have a great deal of difficulty obtaining and maintaining a job with his low functioning level." (Tr. 355).

The ALJ considered this opinion in its entirety (Tr. 24) and then evaluated it as follows: "That opinion is accorded little to partial weight because it is inconsistent with the evidence of record and is conclusory with no specific limitations. It would appear that the opinion places too much weight on the subjective complaints and reporting of the claimant." (Tr. 25).

Ford argues that "the ALJ failed to consider these results" and did not explain "how they supported his conclusions, including his rejection of Dr. Dickson's opinion." (Doc. #17 at 10). But, as already pointed out, the ALJ clearly did consider these results. (Tr. 24). In addition, he dedicated an entire paragraph to explaining how he analyzed this opinion. (Tr. 25). Similar to

Dr. Kirzner's addendum addressed above, the ALJ did not reference McCullough's assessment in his discussion of Dr. Dickson's opinion, which, as the Commissioner points out, the ALJ "did not reject . . . completely, but gave [one aspect of] it partial weight."  (Doc. #18 at 14).  Because the ALJ properly considered Dr. Dickson's opinion, his failure to reference McCullough's assessment in that part of the decision is of no consequence.

Ford also takes issue with the ALJ's reasons for giving McCullough's assessment little to partial weight.  (Doc. #17 at 10).  He claims that "[i]nstead of considering this evidence as it established [his] disability, the ALJ dismissed Ms. McCullough's opinion, and purported to give it 'partial weight because it is inconsistent with the evidence [in the] record and is conclusory with no specific limitations.'"  (*Id.*).  Ford argues that "[t]he claim that this opinion is 'conclusory' is bitterly ironic considering that the ALJ's entire 'rationale' consists of purely conclusory and unsupported statements."  (*Id.*).  He also challenges the ALJ's finding of inconsistency with the evidence because the ALJ included "no reference to any supposedly inconsistent evidence." (*Id.*).  As to the ALJ's conclusion that McCullough's assessment "places too much weight on [Ford's] subjective complaints and reporting" (Tr. 25), Ford argues that "[t]his [is] exactly contrary to the actual evidence as summarized above."  (Doc. #17 at 10).

Here, the ALJ's discussion of McCullough's assessment satisfies SSR 06-03p and is therefore not flawed.  Evidence from "other sources" must be considered, *see* SSR 06-03p, 2006 WL 2329939, at *3-4, and the ALJ did exactly that.  While Ford contends that this evidence should have been considered "as it established [his disability]," information from "other sources," such as McCullough, "cannot establish the existence of a medically determinable impairment."  *Id.* at *2.  Nor is her "other source" opinion entitled to "any special deference." *Davis*, 2018 WL 1377790, at *8.  As to Ford's other arguments alleging that the ALJ's

statements are "conclusory," "unsupported," and "false," Ford has not supported these claims of error with a clear explanation and citations to legal authority indicating that remand is appropriate.  Thus, the Court will not recommend remand as to this issue.

### b.  Meiers' and Thomas' Sworn Affidavits

In a sworn affidavit dated December 28, 2016, Meiers averred that he has known Ford for approximately five years and that Ford "requested that [Meiers] assist him in his daily life functions," which has included filling out applications for Social Security, Medicaid, and food stamps.  (Tr. 262).  Meiers testified that he also has to read written materials to Ford, such as mail, menus, medication dosage/directions, cell phone "matters," "and all other directions necessary for him to function daily in his life."  (*Id.*).  He indicated that he "handle[s] all management of [Ford's] financial affairs," manages his appointments, and reminds him to take his medication at scheduled times.  (Tr. 263).  Meiers stated that Ford "cannot keep a schedule of any kind," is "easily angered and can become very volatile," and "loses emotional control for reasons that are very hard to anticipate or understand."  (*Id.*).  Meiers averred "[t]hat because of [Ford's] inability to maintain any focus whatsoever, or respond appropriately to any directions, [he] believe[s] it would be impossible for him to work with any kind of consistency, []or get along with supervisors or fellow workers."  (*Id.*).

Approximately one week later, on January 3, 2017, Thomas signed a sworn affidavit indicating that she was Ford's special education teacher in ninth through twelfth grade.  (Tr. 284).  She averred that Ford qualified for special education services based on "Specific Learning Disability – Emotional Impairment."  (*Id.*).  She stated that he had "extreme deficits" in math and reading and had "very severe emotional problems" and "emotional instability."  (Tr. 284-85).  She recalled that had "emotional outbursts for no obvious reason," was unable to control his

emotions when he was frustrated, and reacted "inappropriately" when he was angry.  (Tr. 285).

Thomas indicated that given her familiarity with the standards and requirements for employees

in a work environment from running Thomas Appliance with her husband for over twenty years,

she "do[es] not believe it would be possible to integrate [Ford] into that setting."  (*Id.*).

The ALJ thoroughly considered Meiers' and Thomas' sworn affidavits.  (Tr. 24).

Beyond that, he appropriately explained that their opinions regarding Ford's ability to work, to

interact with supervisors and co-workers, and to integrate into a work environment "fall under

the category of 'other source opinions' (non-medical)."  (Tr. 25).  He then explained that

> [t]hese opinions are accorded little weight because the evidence of record,
> including [Ford's] lack of treatment, and other opinion evidence, does not
> support the severity of the alleged impairment contained in these opinions.
> In addition, Ms. Thomas' opinion is based on a period of time when
> [Ford] was in high school and is not a reliable source of opinion as to how
> [Ford] was functioning during the period at issue.

(*Id.*).

As to Meiers' sworn affidavit, Ford argues that the regulations "[d]o not allow baseless

rejection of non-medical source opinions, but only that their weight is not the same as a medical

opinion."  (Doc. #17 at 11).  In Ford's view, "[w]here, as here, however, the opinion is fully

consistent with the medical evidence, the ALJs' refusal to fully credit it violates those

regulations."  (*Id.*).  Importantly, Ford does not identify what regulations he is relying on.  Nor

does Ford identify what medical opinions he contends are "fully consistent" with Meiers'

assertions.  Regardless, the ALJ did not reject Meiers' statement in a "baseless" fashion, as Ford

contends.  Instead, the ALJ properly laid out his reasons for giving it little weight.  Given that

Meiers is an "other source," the ALJ was under no obligation to "fully credit" his statement

simply because, according to Ford, it was "fully consistent with the medical evidence."  (*Id.*).

As to both Meiers' and Thomas' sworn affidavits – which the ALJ gave little weight "because the evidence of record, including [Ford's] lack of treatment, and other opinion evidence, does not support the severity of the alleged impairment contained in these opinions" (Tr. 25) – Ford argues that "[t]he ALJ cited no such 'inconsistent' evidence but instead relied on purely conclusory and unsupported statements instead of an actual rationale." (Doc. #17 at 11). The Court disagrees. In making this determination, the ALJ provided a clear rationale and explained his reasoning by pointing to Ford's lack of treatment and "other opinion evidence."

While it would have been preferable for the ALJ to specify the opinion evidence he was referring to, a subsequent reviewer can determine what evidence supports this determination by reading the ALJ's thorough discussion of the opinion evidence. (Tr. 21-24). Ford does not dispute the ALJ's finding about a lack of treatment. Moreover, although in this portion of his decision the ALJ only referenced "other opinion evidence," as discussed above, elsewhere in his decision the ALJ noted that Ford reported to Dr. Dickson that he was able to work with his hands, had a girlfriend for three years, completed household chores, cooked, made purchases, and counted money. (Tr. 22). In addition, the ALJ noted that Dr. Dickson's mental status examination revealed that Ford was "in contact with reality and maintained a 'positive attitude' despite being 'markedly immature.'" (*Id.*). The ALJ also reviewed Ford's high school report card and noted that he had a 3.075 GPA in the 2006-07 school year, which went up to a 3.45 in the 2007-08 school year. (Tr. 23). The ALJ considered that Ford told Dr. Marshall in 2016 that he had lived with friends for the past eight years and that he got along with his roommate "well." (*Id.*). He drove himself to Dr. Marshall's evaluation, where he denied receiving any psychological care and Dr. Marshall found that his motor activity was normal and that he was "able to understand, remember, and complete simple and repetitive tasks." (*Id.*).

Finally, as mentioned above, pursuant to SSR 06-03p, the ALJ only had to consider these "other source" opinions; he was under no obligation to analyze them in a particular way or to give them controlling weight.  SSR 06-03p, 2006 WL 2329939, at *3; *Davis*, 2018 WL 1377790, at *8; *Alcaraz*, 2018 WL 1477581, at *3.  The Court finds that the ALJ appropriately exercised his discretion in determining what weight to give Meiers' and Thomas' sworn statements, and Ford has not shown otherwise.  *Alcaraz*, 2018 WL 1477581, at *4.

> **3.**    *The ALJ Did Not Err in Failing to Consider Ford's Work History and Behavior at the Hearing*

> **a.**  Work History

Ford argues that the ALJ's decision "is contrary to the actual record" because the ALJ "fail[ed] to address how [Ford's] work history established his ability to work."  (Doc. #17 at 11). Ford points to his own hearing testimony that he was fired any time he tried to work and that although he didn't remember why, he later recalled that he was fired from a "simple job" after a little less than one week because "they didn't like the way [he] was doing it and stuff . . . . so, it was just arguing the whole time."  (*Id.*) (citing Tr. 46, 52).  In addition, Ford highlights that "he later stated that he did not like being around people at all."  (*Id.*) (citing Tr. 48).  According to Ford, this testimony "is fully consistent with Dr. Dickson's findings."  (*Id.*).

Here, the ALJ did consider Ford's testimony about his work history.  Specifically, the ALJ mentioned in his decision that Ford "reported being 'fired' from all previous employment."[4] (Tr. 22).  The ALJ also mentioned that Ford testified that he has "difficulty being around people"

---

[4] Although the ALJ did not mention Ford's reasons for why he was fired, the ALJ does not have to discuss every single piece of evidence to show that he considered it, as explained above.  *See Kornecky*, 167 F. App'x at 508.  Here, given the ALJ's reference to Ford's work history in his decision and his assertion that the RFC is based on "all the evidence" (Tr. 21-22), it is reasonable to conclude that he considered Ford's testimony in full.

and he "does not like crowds or people in general."[5]  (Tr. 21).  As the Commissioner points out,

the ALJ took this testimony into account in limiting Ford's RFC to "no interaction with the

public and only occasional superficial interaction with the coworkers."  (*Id.*); (Doc. #18 at 18).

Thus, contrary to Ford's argument, the ALJ did consider his work history in evaluating his

ability to work.[6]  Ford argues that his testimony is "consistent with Dr. Dickson's findings," but

he does not point to which findings by Dr. Dickson he is referring to and does not explain what

the ALJ should have done differently and how a different analysis would change the RFC and/or

the outcome of the case.  In addition, Ford similarly does not point to case law demonstrating

_____

[5] In addition, the ALJ considered that Ford told Dr. Dickson that "he did not want to know anybody he did not already know."  (Tr. 22).  The ALJ also referenced the fact that Ford "indicated he stays with his friend [] Meiers, a friend named Andy, and his grandparents," and, a few years earlier had lived "with his girlfriend."  (*Id.*).

[6] Ford does not appear to challenge the ALJ's credibility assessment in arguing that the ALJ failed to consider his work history, even though a claimant's work history is typically a factor that affects credibility.  "It is the ALJ's function to determine credibility issues, and the claimant's work history is only one of the many factors that the ALJ can consider in making his credibility determination."  *Evilsizor v. Comm'r of Soc. Sec.*, No. 1:16-cv-1136, 2017 WL 3124159, at *6 (W.D. Mich. July 23, 2017) (internal quotation and citation omitted); *Cain v. Comm'r of Soc. Sec.*, No. 1:16-cv-1071, 2017 WL 4129399, at *6 (E.D. Mich. Sept. 19, 2017) (internal citations omitted); *Perrault v. Comm'r of Soc. Sec.*, No. 1:14-CV-942, 2015 WL 5592931, at *6 (W.D. Mich. Sept. 22, 2015); 20 C.F.R. § 404.1529(c)(3) ("We will consider all of the evidence presented, including information about your prior work record . . . .").  But an "ALJ [i]s not required to explicitly discuss [a plaintiff's] work history when assessing his credibility."  *Evilsizor*, 2017 WL 3124159, at *6 (quoting *Dutkiewicz v. Comm'r of Soc. Sec.*, 663 F. App'x 430, 433 (6th Cir. 2016)).  Moreover, a claimant is not entitled to "substantial credibility" because he has a good work history and earnings history.  *See Sorrell v. Comm'r of Soc. Sec.*, 656 F. App'x 162, 174 (6th Cir. 2016) (finding no grounds that the claimant is entitled to "substantial credibility" based on her "'exemplary work' history"); *Jones v. Comm'r of Soc. Sec.*, No. 4:14-cv-14417, 2016 WL 759439, at *2 (E.D. Mich. Feb. 26, 2016).  Thus, even if the ALJ had not considered Ford's work history in his credibility analysis at all, this would not provide automatic grounds for remanding the case.  *Smith v. Berryhill*, No. 16-14041, 2017 WL 6803422, at *6 (E.D. Mich. Nov. 20, 2017) (citing legal authority that "does not establish that an ALJ's failure to explicitly consider the claimant's work history or efforts is reversible error when his credibility analysis is otherwise supported by substantial evidence").

that that the ALJ's alleged failure to mention his work history merits remand.  Such an underdeveloped argument does not entitle Ford to the relief he seeks at this time.

b.  <u>Behavior at the Hearing</u>

Ford also argues that the ALJ failed to mention that during the hearing Ford "became angry" two times, "and on the second occasion had to be warned [by the ALJ] that he would be removed from the court[]room if he interrupted again."  (Doc. #17 at 12).  Ford argues that the ALJ also failed to explain how this was consistent with the RFC finding, as well as failed to consider how it supported Dr. Dickson's opinion, "which he rejected."  (*Id.*).  Similar to his argument about work history, Ford does not explain why these alleged failures constitute reversible error and omits any mention of applicable legal authorities.

Here, the ALJ properly considered this type of behavior as exhibited by Ford.  To begin with, the Court already determined that the ALJ appears to have considered Ford's entire hearing testimony, which includes the two instances of him "bec[oming] angry" that Ford references.  *See supra* note 4.  Given that the ALJ was present at the hearing and was the one who issued the warning to Ford, he was aware of Ford's behavior.  Even though the ALJ did not explicitly mention the two instances of anger Ford now highlights in his decision, the ALJ did cite to other evidence that goes to Ford's anger issues.  For example, in addition to Ford's testimony mentioned above regarding Ford not liking crowds or people, the ALJ noted that Meiers' Function Report indicated that Ford was "short" with family members and others, that Meiers' hearing testimony indicated that Ford "is short-tempered" and has "explosive outbursts," and that Meiers' sworn affidavit indicated that Ford "becomes easily angered and can become volatile" and "loses emotional control for reasons that are hard to anticipate or understand."  (Tr. 21-22, 24).  The ALJ also noted that Thomas' affidavit stated that Ford "was unable to control his

emotions when frustrated and had outbursts at times for no obvious reason." (Tr. 24). In addition, the ALJ considered that Dr. Dickson recorded that Ford "claimed he got frustrated when he did not comprehend something." (Tr. 22). The ALJ also noted that one of Dr. Kirzner's diagnoses for Ford was adjustment disorder with disturbance of emotions and conduct and that in his addendum, Dr. Kirzner opined that Ford is unlikely to have "the ability [or] the emotional temperament to sustain gainful, consistent employment where adaptations are required." (Tr. 23). Thus, the ALJ sufficiently considered Ford's behavior and properly explained how it played a role in his decision; in formulating the RFC, the ALJ explained that "[t]he record confirms [Ford] is capable of restricted work that takes into account . . . adjustment disorder," among other conditions. (Tr. 24).

Finally, the Court has already determined that the ALJ committed no error with respect to his analysis of Dr. Dickson's opinion, which the ALJ did not reject but rather gave partial weight. (*See* Tr. 24). Nothing raised by Ford here alters that conclusion. Accordingly, Ford's argument as to the ALJ's failure to consider his behavior at the hearing lacks merit.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [18] be GRANTED, that Ford's Motion for Summary Judgment [17] be DENIED, and that the ALJ's decision be AFFIRMED.


Dated: May 22, 2018                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 22, 2018.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager